847 P.2d 129

**In re the Marriage of Gary Gerard FENN, Petitioner–Appellee,**

v.

**Jasmin FENN, Respondent–Appellant.**

**No. 1 CA–CV 89–469.**

Court of Appeals of Arizona, Division 1, Department C.

Feb. 11, 1993.

Meyer, Vucichevich & Burns, P.C. by Rad L. Vucichevich, Annette T. Burns, Phoenix, for petitioner-appellee.

Shari I. Howard, P.C. by Shari I. Howard, Phoenix, for respondent-appellant.

## OPINION

FIDEL, Chief Judge.

Jasmin Fenn (wife) appeals from a final decree dissolving her marriage with appellee Gary Fenn (husband). The appeal presents numerous issues, most of which we resolve in a contemporaneous, unpublished memorandum decision. In this published portion of our decision, we uphold the trial court's ruling that it lacked jurisdiction to award support for a child in wife's physical custody who was neither born to nor adopted by husband and wife, but whom husband and wife had taken preliminary steps to adopt.

## PARTIAL PUBLICATION

We publish only this part of our decision because only this part meets the standards for publication set forth in Ariz. R.Civ.App.P. 28(b). Although rule 28(b) does not expressly provide for partial publication, neither does it expressly proscribe it, and we see no reason to publish the lengthy remainder of our analysis, which merely applies settled law to facts that concern the parties alone.

## FACTS AND PROCEDURAL HISTORY

Husband and wife were married on September 4, 1982. No children were born to them. They separated in May of 1988, and husband commenced this dissolution action.

In November of 1986, the parties applied to the Maricopa County Juvenile Court to be certified to adopt children. *See* Ariz. Rev.Stat.Ann. ("A.R.S.") § 8–105 (1989). They were certified in April of 1987 after

completing the Adoptive Parents' Education Program at St. Joseph's Hospital in Phoenix. Their certification was valid for one year or until the filing of an earlier petition to adopt.

In September of 1987, husband and wife filed an adoption application with Catholic Social Service of Phoenix. On December 22, 1987, that agency placed a three and one-half month old baby girl with them. In an "Adoption Agreement" at the time of placement, husband and wife assumed responsibility for the child's financial, physical, and emotional well-being, but Catholic Social Service retained legal custody until adoption or other change in legal status.[1]

The child lived with husband and wife from December of 1987 until they separated in May or June of 1988. During this time, the parties supported her, included her in holiday travel, and held a party to celebrate her christening.

After the separation, husband chose not to remain part of the child's life, and the parties agreed that wife—with whom the child was still placed—would seek to adopt her alone.[2] They learned, however, that wife could not singly adopt under their joint certification and must seek certification as a single parent. If certified, she could then file a new adoption petition with the juvenile court and a new application with Catholic Social Service. That agency would then conduct a new home study, file an up-to-date placement report, and recommend whether adoption should be ordered. In a normal, uncomplicated adoption, this would take six to nine months.

The parties' joint certification to adopt expired before trial and was not renewed. As of the trial in April of 1989, wife had not petitioned to adopt the child. A Catholic Social Service caseworker testified that the child was left with wife, though no adoption proceedings were pending, because it would have been disruptive to remove her from the only home she had known, where she was cared for and loved.

After a trial to the court, the trial court entered a final decree of dissolution of marriage, which provided in relevant part:

> That the court does not have jurisdiction under A.R.S. § 25–320 to enter an order of support for a child not born to or adopted by the parents in this action.

Wife timely appealed.

## DISCUSSION

Wife's arguments are essentially three: 1. that initiation of adoption proceedings empowered the court to promote the best interests of the child by imposing a support obligation on husband even though the adoption did not go through; 2. that husband, by taking preliminary statutory steps toward adoption, assuming physical custody of the child, and supporting her for six months, voluntarily acted *in loco parentis* and may now be assigned a parent's obligations toward the child; 3. that husband, by taking preliminary steps toward adoption, has promoted the formation of mother-child bonds that cannot be broken without damaging the child's welfare, and he therefore should be estopped to deny an obligation to support the child.

None of these arguments provides a basis for imposing child support in this case.

### A.  Best Interests

■  We begin with the assertion that the parties' preliminary steps toward adoption empowered the trial court to advance

---

1.  The parties dispute the sincerity of their representations to Catholic Social Service. Husband testified that he had never intended to adopt the child, that his contrary representation to the agency was false, and that he and wife had intended to divorce from the outset of their adoptive effort but had agreed to misrepresent the viability of their marriage to secure a child as a couple whom wife would go on to adopt alone. Wife testified, by contrast, that the sub-

ject of divorce did not arise until the time of their separation in May or June of 1988.

2.  According to husband, wife agreed that if he supported her effort to adopt alone, she would neither seek child support nor use her child care responsibilities as a basis for spousal maintenance. According to wife, husband was inadequately supportive and thus broke the agreement, whatever its terms.

the child's best interests by awarding child support in the dissolution decree. Courts may do many things in the best interests of children, but they cannot advance such interests by exercising jurisdiction that they lack. Every power that the superior court exercises in a dissolution proceeding must find its source in the supporting statutory framework. *Anonymous Wife v. Anonymous Husband*, 153 Ariz. 573, 575, 739 P.2d 794, 796 (1987); *Andrews v. Andrews*, 126 Ariz. 55, 58, 612 P.2d 511, 514 (App. 1980).

The superior court's power to order child support in dissolution actions derives from A.R.S. section 25–320 (1991), which provides in part:

(A) In a proceeding for dissolution of marriage, legal separation, maintenance, or child support, the court may order either or both parents *owing a duty of support to a child, born to or adopted by the parents,* to pay an amount reasonable and necessary for support of the child, without regard to marital misconduct....

(emphasis added).

Also pertinent is A.R.S. section 12–2451 (West Supp.1992), which provides in part:

(A) Every man and woman shall have the duty to provide all reasonable support for his or her natural and adopted minor, unemancipated children, regardless of the presence or residence of the child in this state....

■ Under these statutes a domestic relations court may order a party to pay child support only if the child is an unemancipated minor born to or adopted by that party. As we stated in *Hughes v. Creighton*, 165 Ariz. 265, 798 P.2d 403 (App.1990):

The court's authority [to order child support] ... extends only to natural or adoptive parents. Only natural and adoptive parents are legally obligated to financially support their children.

*Id.* at 268–69, 798 P.2d at 406–07 (citation omitted). The court may not order a non-parent to pay support merely because it would advance the child's best interests to receive it.

## B. In Loco Parentis

■ Wife's second argument, based on the concept of *in loco parentis,* also fails. A person acts *in loco parentis* "by assuming the obligations incident to the parental relation." *Garay Uppen v. Superior Court,* 116 Ariz. 81, 83, 567 P.2d 1210, 1212 (App.1977). However, our supreme court has held repeatedly that a person *in loco parentis* is free at any time to cast the relationship aside without retaining an ongoing obligation to pay support. *Solomon v. Harman,* 107 Ariz. 426, 431, 489 P.2d 236, 241 (1971) (foster parents); *Franklin v. Franklin,* 75 Ariz. 151, 156, 253 P.2d 337, 340 (1953) (grandparents); *Magma Copper Co. v. Aldrete,* 70 Ariz. 48, 52, 216 P.2d 392, 395 (1950) (step-parents).

In one case, the plaintiff, having failed to establish his paternity, sought nonetheless to be awarded visitation rights and to be ordered to pay child support, based on his standing *in loco parentis* to the child. *Hughes,* 165 Ariz. at 266, 798 P.2d at 404. We noted that the plaintiff, while living with the child's mother, had signed the birth certificate and established "a close father-son relationship" with the child. *Id.* We ruled, however, that the trial court lacked authority to order child support from one who merely stood *in loco parentis,* stating, "Since [the plaintiff] has no legal obligation to support the child, the court cannot order him to do so." *Id.* at 269, 798 P.2d at 407. We find no basis to rule differently in this case.

## C. Equitable Adoption

Wife's last argument springs from the statutory duty to support one's "adopted minor, unemancipated children." A.R.S. § 12–2451(A); *see also* A.R.S. § 25–320(A). It is undisputed that the child is an unemancipated minor. It is also undisputed that she is not the natural child of wife or husband and that neither wife nor husband has adopted her. *See* A.R.S. § 8–117(A) (1989) (legal rights, privileges, duties, obligations, and other legal consequences of the natural relationship of child and parent come into being upon entry of decree of adoption). Wife argues, however, that hus-

band's behavior toward her and the child amounts to a constructive or equitable adoption, from which he may be estopped to deny the child support.

Wife argues more specifically that husband, by participating in seeking to adopt a child, and by maintaining joint physical custody of this child for six months, led wife to form a mother-child bond that cannot be broken without damaging the welfare of the child. She argues that the mother-child bond now necessitates her adoption of the child as a single parent, which will terminate the child's natural father's support obligations. Having created this situation, wife argues, husband should now be estopped to deny a support obligation as the child's adoptive father.

A considerable body of case law concerns "adoption by estoppel" or "equitable adoption." However, Arizona courts have thus far applied the doctrine only when a child seeks to inherit from the estate of a person who had previously entered an adoption contract with the child's natural parents that, except for statutory formalities, was fully performed during the decedent's lifetime. *See In re Estate of Lamfrom v. Lockard*, 90 Ariz. 363, 366–67, 368 P.2d 318, 321–22 (1962); *In re Estate of Prewitt v. Jones*, 17 Ariz.App. 396, 398, 498 P.2d 470, 472 (1972).

The *Lamfrom* court stated the elements of equitable adoption as follows:

(1) the promisor must promise in writing or orally to adopt the child; (2) the consideration flowing to the promisor must be twofold: (a) the promisee parents must turn the child over to the promisor, and (b) the child must give filial affection, devotion, association and obedience to the promisor during the latter's lifetime; (3) when upon the death of the promisor the child has not been made the legally adopted child of the promisor, equity will decree that to be done which was intended to be done and specifically enforce the contract to adopt; (4) the

child will be entitled to inherit that portion of the promisor's estate which he would have inherited had the adoption been formal. Furthermore it has been held in other jurisdictions that the contract to adopt need not be express, but may be implied from the acts, conduct, and admissions of the adopting parties. *Id.* at 367, 368 P.2d at 321. These elements are specific to inheritance cases, and no Arizona court has attempted to recast them in the context of child support.

Other courts, however, have made limited extensions of estoppel into the arena of child support, when the evidence has established the fundamental estoppel elements of representation and reasonable, detrimental reliance.[3] *See generally* David B. Sweet, Annotation, *Stepparent's Post Divorce Duty to Support Stepchild*, 44 A.L.R. 4th 520, §§ 5, 6 (1986); George A. Locke, Annotation, *Modern Status of Law as to Equitable Adoption or Adoption by Estoppel*, 97 A.L.R.3d 347, §§ 9, 31 (1980).

In *Gursky v. Gursky*, 39 Misc.2d 1083, 242 N.Y.S.2d 406 (1963), for example, a husband was charged with support of a child that wife conceived, with his consent, through artificial insemination by a donor other than himself. The court stated:

There is nothing in the record to indicate that the wife would have undergone artificial insemination in the absence of the husband's consent. Hence it is reasonable to presume that she was induced so to act and thus changed her position to her detriment in reliance upon the husband's expressed wishes. To relieve the husband of any duty of furnishing support for the child resulting from the artificial insemination of the wife, to which she submitted in reliance on her husband's wishes, would cast a financial burden upon the wife which in equity and good conscience should be borne by the husband. The circumstances properly call for invocation and application of the doctrine of equitable estoppel so as to cast upon the husband, as between hus-

3. In *Heltzel v. Mecham Pontiac*, 152 Ariz. 58, 730 P.2d 235 (1986), our supreme court defined the elements of estoppel as follows: "(1) conduct by which one induces another to believe in certain material facts; and (2) the inducement results in acts in justifiable reliance thereon; and (3) the resulting acts cause injury." *Id.* at 61, 730 P.2d at 238.

band and wife, the primary duty of support for the child here involved. 242 N.Y.S.2d at 411–12.

In *T v. T*, 216 Va. 867, 224 S.E.2d 148 (1976), wife, then pregnant and unmarried, gave up her plan to place her baby for adoption in reliance on husband's promise that, if she would keep the child and marry him, he would care for the child as if it were his own. *Id.* 224 S.E.2d at 149. The parties married, husband had himself listed as father on the birth certificate, and husband thereafter claimed the child as his dependent for tax purposes and generally held himself out as the child's father for four years. *Id.* When the parties divorced, the trial court denied support because husband disproved paternity. *Id.* at 150. The appellate court reversed, however, on the ground that husband had entered an express oral contract to provide child support. *Id.* at 151. The court further held that, because husband's promises had caused wife to act to her detriment, he was estopped from asserting the defense of the statute of frauds. *Id.* at 152.

In *Frye v. Frye*, 103 Nev. 301, 738 P.2d 505 (1987), when the parties married, husband initiated proceedings to adopt wife's one and one-half year old daughter. Although the marriage deteriorated before adoption was accomplished and the effort was ultimately abandoned, in the interim, husband and wife sought and accomplished the termination of the natural father's parental rights, knowing that this would leave the child without a father. *Id.* Wife joined in the petition to terminate based on husband's promise to adopt the child. *Id.* Under Nevada law, the termination of the father's parental rights left the child without recourse against her natural father for support. *Id.* In the divorce proceeding, the trial court imposed a child support obligation on husband, and the Supreme Court of Nevada affirmed based on a theory of equitable adoption. The court stated:

> We do not hold that every equitable adoption necessarily confers all the rights and obligations attendant upon full legal adoption. Nor do we depart

from the doctrine of *Sargeant [v. Sargeant*, 495 P.2d 618 (1972)]* that one who places himself *in loco parentis* with respect to a child, without more, may terminate that status at will. However, where there is a promise to adopt, and in reasonable, foreseeable reliance on that promise a child is placed in a position where harm will result if repudiation is permitted, the courts of this state stand ready to provide such remedies as equity requires.

738 P.2d at 506 (footnote omitted).

In *Clevenger v. Clevenger*, 189 Cal. App.2d 658, 11 Cal.Rptr. 707 (1961), wife conceived a child with another man while husband was in military service; but husband accepted the child into the family, was listed as father on his birth certificate, and acted as the child's father until dissolution proceedings began when the child was eleven years old. *Id.* 11 Cal.Rptr. at 709. The court of appeal remanded for further evidence, holding that a child support obligation could arise through estoppel predicated "upon the child's acceptance of the representation of the putative father that he is the natural father." *Id.* at 716. The court added:

> [T]he representation must be of such long continuance that it frustrates the realistic opportunity of discovering the natural father and truly establishes the paternal relationship of the putative father and the child. We do not discuss here a relationship of some passing days; this relationship continued over the span of a decade.

*Id.* at 717; *accord, Ross v. Ross*, 126 N.J.Super. 394, 314 A.2d 623, 625–26 (Juv. & Dom.Rel.Ct.1973), *aff'd mem.*, 135 N.J.Super. 35, 342 A.2d 566 (1975).

■ We do not foreclose that, in a case similar to those we have reviewed, Arizona courts might similarly estop a putative father from denying an obligation to support a putative child. However, this is not such a case. First, wife, though eligible to do so, had not pursued single parent adoption by the close of trial court proceedings.[4]

4. A.R.S. section 8–103 provides: "Any adult resi-   dent of this state, whether married, unmarried

Nor was she legally obliged to do so.[5] Second, there was no evidence that wife was obliged to proceed with adoption in order to retain physical custody of the child. The only evidence on that topic was, to the contrary, that Catholic Social Service thought it in the child's best interests to remain with wife, though she had not reinstituted proceedings to adopt. Third, there was no evidence that husband's conduct deprived the child of recourse to her natural father for support; rather, the record is silent concerning the natural father and his ability to support the child. Fourth, there was no evidence that husband's conduct had induced the child to rely on his presence or availability as a father. *Compare Clevenger v. Clevenger,* 11 Cal. Rptr. at 717 (ten-year paternal relationship might give rise to equitable adoption, in contrast to "relationship of some passing days") *with Hughes v. Creighton,* 165 Ariz. at 269, 798 P.2d at 407 (sixteen months of close paternal bonding did not permit court to order support, though putative father sought to establish his own duty to pay it). Finally, there was no evidence that wife relied, detrimentally or otherwise, on husband's presence, support, or availability as a father. The evidence on this issue suggests instead that wife provided the impetus toward adoption and intended, at least in the early stages of dissolution, to go forward with or without husband's participation.

We conclude that wife has failed to establish a claim for estoppel against husband on this record.

### CONCLUSION

Because wife has failed to provide any legal basis for ordering husband to pay child support, the trial court's order declining to award child support is affirmed.

EHRLICH, P.J., and TAYLOR, J., concur.

---

or legally separated is eligible to qualify to adopt children. A husband and wife may jointly adopt children."

**5.** A.R.S. section 8–113(B) (West Supp.1992) permits certified prospective adoptive parents with whom an adoption agency has placed a child to return the child to the placing agency.